901 A.2d 963

IN THE MATTER OF ANTHONY TAVALARIO.

Superior Court of New Jersey
Appellate Division

Submitted January 24, 2006—Decided June 27, 2006.

Before Judges SKILLMAN, AXELRAD and PAYNE.

*Anthony Tavalario,* appellant, filed a pro se brief.

*Nancy Kaplen,* Acting Attorney General, attorney for respondent State Agriculture Development Committee (*Lewis A. Scheindlin,* Assistant Attorney General, of counsel; *Eileen P. Kelly,* Senior Deputy Attorney General, on the brief).

*Holston, MacDonald, Uzdavinis, Eastlack & Ziegler,* attorneys for respondent Township of Washington (*Cheryl L. Cooper,* on the brief).

The opinion of the court was delivered by

PAYNE, J.A.D.

This appeal presents a challenge by Anthony Tavalario to the manner in which the State Agricultural Development Committee (SADC) determines whether keeping horses on property constitutes a "commercial" agricultural operation that exempts the property from local zoning and other land use restrictions as the result of the preemptive force of the Right to Farm Act, *N.J.S.A.* 4:1C–1 to –10.4. The SADC found that Tavalario's use of the land did not qualify for protection under the Act, because he could not demonstrate that, as of July 3, 1998, his operation produced "agricultural or horticultural products worth $2,500 or more annually" as required by the definitional section of the Act, *N.J.S.A.* 4:1C–3a, and the Act's preemption provision, *N.J.S.A.* 4:1C–9, which enumerates the permitted activities of qualified commercial farm owners and operators. The SADC construed the Act's definition of a commercial farm to mean that a farmer must actually derive $2,500 in income or demonstrate that he entered

into a contract to derive that amount in income in order to satisfy the annual production requirement. Tavalario contends on appeal that the SADC erred because it failed to consider as income in 1998 uncollected stud fees, the imputed value of a horse sold as a broodmare in 2002 for $8,000 and another horse sold in 2003 for $5,400, and race winnings of an undisclosed amount allegedly awarded at an unspecified time after 1998.

The statute itself is silent as to how the production requirement of *N.J.S.A.* 4:1C-3 and -9 is to be construed, and thus the SADC was required to interpret it, which it did in the manner that we have described. On appeal, we decline to disturb the SADC's conclusion that Tavalario did not meet the production requirement as construed by the agency, recognizing that "[t]o uphold an agency's construction of a statute that is silent or ambiguous with respect to the question at issue, a reviewing court need not conclude that the agency construction was the only one it permissibly could have adopted, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding." *Matturri v. Bd. of Trs. of Judicial Ret. Sys.*, 173 *N.J.* 368, 382, 802 *A.2d* 496 (2002) (quoting *Kasper v. Bd. of Trs. of Teachers' Pension and Annuity Fund*, 164 *N.J.* 564, 581, 754 *A.2d* 525 (2000)). To uphold the agency's decision, we need only to conclude that it "is based on a permissible construction of the statute." *Ibid.* We find that standard to have been met in this case.

## I.

The record establishes that Tavalario purchased the 7.37-acre property in question, located in Washington Township, Gloucester County, in December 1995. The property (on which had been previously constructed a single-family residence, in-ground pool and garage) had been subdivided in 1990 into three lots and had been rezoned in 1995 from agricultural use to inclusion in an "A" Residence District in which agriculture constituted only a condi-

tional use for which a "c" variance was required. *N.J.S.A.* 40:55D–70c.

In 1996, Tavalario commenced to keep horses on the property, utilizing land fronting on a local road and "cut out" portions of rear woodlands for that purpose. Tavalario's application for a farmland tax assessment and records of equine births and deaths disclose that in April 1997, a foal was born dead on the property to a broodmare, and that a second broodmare had aborted. In 1998, Tavalario maintained on the property a stallion, Nasty Charger, kept primarily for breeding, two broodmares, Proculator and Morning Chant, and two foals, First Place Lady (foaled by Proculator) and Son Chant (foaled by Morning Chant). Morning Chant died in May 1998 while giving birth to Son Chant. A third horse, Lady Winsum, was foaled by Proculator in 1999.[1] First Place Lady was sold as a broodmare in 2002 for $8,000, and one of the other two foals appears to have been sold a year later for $5,400. Additionally, evidence was presented that Tavalario had boarded a neighbor's horse at "various times" from 1996 to 1999 to permit the neighbor to reseed his pasture and go on vacation, and that Tavalario boarded two ponies from October 1, 1998 to January 23, 1999. Both Lady Winsum and Son Chant were entered in races while owned by Tavalario, but the dates of the races and any race earnings have not been specified. Evidence also was presented that Nasty Charger was advertised for stud in 1997. Tavalario claims that $4,000 in stud fees were waived in 1998 so as to qualify for the New Jersey Breeders Fund award program, but no evidence of a waiver requirement has been offered.

The record additionally contains a statement provided in connection with Tavalario's application for a farmland tax assessment during 1998 that he had received gross income from farming activities in the amount of $600 consisting of stud fees in each of

---

[1] The record does not disclose the manner of use of the land by horses after 1999, although they remain on the property pursuant to a stay entered by the SADC following appeal from its final decision.

the years 1996, 1997 and 1998. Tavalario's IRS statements of profit and loss from farming reflect an income of $675 for 1998; $580 for 1999; $600 for 2000; $600 for 2001; $9,390 for 2002; and $5,400 for 2003.

In April 1999, Washington Township informed Tavalario that breeding and keeping horses in an "A" Residence zone required a conditional use variance, and then filed a notice of zoning violation against him. Tavalario commenced the process of obtaining a variance, but later withdrew his application, choosing instead to rely on his claim that he was engaged in a permitted use under the Right to Farm Act, and thus local zoning was preempted. In March 2000, the Township's claim of zoning violation came before the municipal court, which determined in light of the potentially preemptive effect of the Right to Farm Act to adjourn proceedings pending a determination by the Tax Court whether Tavalario was entitled to farmland tax treatment[2] and a determination by the Gloucester County Agriculture Development Board (CADB) regarding the applicability of the Right to Farm Act.

Following a hearing, the CADB concluded that Tavalario's operation constituted a "commercial" farm protected by the Right to Farm Act. Upon appeal to the SADC, the matter was referred

---

[2] The Tax Court's decision was not issued until some time after the final decision of the SADC. In it, the court found that Tavalario failed to meet the criteria for farmland assessment from 1998 forward because the area used by him was less than the five acres required by the tax statute. However, the court did not order rollback taxes for the years 1998 and 1999, concluding that the municipal tax assessor was procedurally barred from that relief.

Prior to amendments effective July 2, 1998, in order to invoke the Right to Farm Act's protections enumerated in *N.J.S.A.* 4:1C–9, that provision required that an owner or operator of a "commercial farm" meet the eligibility criteria for differential property taxation pursuant to the Farmland Assessment Act of 1964, *N.J.S.A.* 54:4–23.1 to –23.24. That requirement was eliminated from *N.J.S.A.* 4:1C–9 by the amendments, but it was added to the definition of a "commercial farm" in *N.J.S.A.* 4:1C–3. *L.* 1998, *c.* 48 §§ 1 and 2. Tavalario's failure to meet this requirement provides another substantive basis upon which the inapplicability of the Right to Farm Act to his horse breeding operation could be premised.

to the Office of Administrative Law for a contested case hearing pursuant to *N.J.S.A.* 4:1C–10.2. The administrative law judge (ALJ), likewise, found in a decision issued on June 14, 2004 that Tavalario qualified for Right to Farm Act zoning preemption, concluding that he could be deemed to have produced agricultural products worth $2,500 or more annually, despite the lack of contemporaneous evidence that he had done so. In reaching this conclusion, the ALJ analogized Tavalario's circumstances to that of a timber producer whose crop required maturation before profits could be realized. The judge relied in this regard upon a decision by the SADC in *In the Matter of Joseph P. Arno (Appeal of Resolution Issued by the Monmouth County Agriculture Development Board)*, SADC ID # 1328–02, OAL Docket No. ADC 4748–03 (February 25, 2004).

In *Arno,* the SADC had found that the applicant's growth of unharvested timber would qualify the property as a commercial farm if (1) the farmer had a written contract to provide a specified amount of wood from his trees within a specified time frame; (2) he had obtained a woodland management plan prepared by a certified forester; and (3) he had received a signed statement from a certified forester certifying that he had a sufficient number of trees ready to harvest to fulfill the terms of the written contract.[3]

Because Tavalario could not produce a contract analogous to that required in *Arno* (an evidentiary requirement omitted from the ALJ's analysis), at its public meeting of July 22, 2004, the SADC rejected the ALJ's conclusion that Tavalario's operation met the definition of a commercial farm found in *N.J.S.A.* 4:1C–3a. Its final decision was mailed to the Office of Administrative Law in an envelope postmarked July 29, 2004. The decision was later sent to the Governor on October 1, 2004.

---

[3] The SADC's requirements for timber growers echo those found in relevant provisions of the Farmland Assessment Act of 1964, *N.J.S.A.* 54:4–23.3a–c.

On appeal, Tavalario has challenged the SADC's decision substantively, because the SADC failed to consider the imputed value of his horses in determining agricultural production, and on procedural grounds, because the SADC's submission of its final decision to the Governor was untimely and thus arguably void.

## II.

The Right to Farm Act, initially passed in 1983, was enacted to "promote, to the greatest extent practicable and feasible, the continuation of agriculture in the State of New Jersey while recognizing the potential conflicts among all lawful activities in the State." *Senate Natural Resources and Agriculture Committed Statement*, Senate, No. 854–L. 1983, c. 31. Among the Legislature's findings set forth in *N.J.S.A.* 4:1C–2 was its recognition that the "retention of agricultural activities would serve the best interest of all citizens of this State by insuring the numerous social, economic and environmental benefits which accrue from one of the largest industries in the Garden State." *N.J.S.A.* 4:1C–2a. However, the Legislature also recognized the tension existing between agriculture and other uses of the land, stating, for instance: "It is the express intention of this act to establish as the policy of this State the protection of commercial farm operations from nuisance action[s], where recognized methods and techniques of agricultural production are applied, while, at the same time, acknowledging the need to provide a proper balance among the varied and sometimes conflicting interests of all lawful activities in New Jersey." *N.J.S.A.* 4:1C–2e; *see also Borough of Closter v. Abram Demaree Homestead, Inc.*, 365 *N.J.Super.* 338, 346, 839 *A.*2d 110 (App.Div.), *certif. denied*, 179 *N.J.* 372, 845 *A.*2d 1254 (2004). The limitation of the Act's provisions to "commercial" farms constitutes a mechanism by which that balance was struck.

*N.J.S.A.* 4:1C–3, as amended in 1998 (*L.* 1998, *c.* 48 § 1), defines "[c]ommercial farm" as

(1) a farm management unit of no less than five acres producing agricultural or horticultural products worth $2,500 or more annually, and satisfying the eligibility

criteria for differential property taxation pursuant to the "Farmland Assessment Act of 1964," [N.J.S.A. 54:4–23.1 to –23.24], or (2) a farm management unit less than five acres, producing agricultural or horticultural products worth $50,000 or more annually and otherwise satisfying the eligibility criteria for differential property taxation pursuant to the "Farmland Assessment Act of 1964."

N.J.S.A. 4:1C–9, as amended in 1998 (L. 1998, c. 48, § 2), the other provision that is the focus of this litigation, enumerates permissible activities that can be conducted by owners or operators of "commercial" farms, including the continuation of agricultural activities such as livestock production regardless of local zoning. However, in order to receive the provision's protections, the owner or operator must (1) have owned or operated a "commercial farm" in an area in which agriculture was a permitted use under municipal zoning ordinances as of December 31, 1997 that is consistent with the municipal master plan, or (2) have owned or operated a "commercial farm" in operation as of July 3, 1998 that complies to specified agricultural management practices, conforms with all relevant federal or State statutes or rules and regulations, and does not pose a direct threat to public health and safety.

Because the zoning of Tavalario's property was amended to "A" Residence in 1995 under an ordinance that denominated agriculture as a "conditional" not a "permitted" use, he could not comply with the first portion of the statute's qualification provision. Tavalario's efforts were therefore directed at the second means of qualification and centered on the requirement that he demonstrate that he operated a "commercial farm" as of July 3, 1998. The SADC, the entity charged with interpreting and implementing the Right to Farm Act, Twp. of Franklin v. Hollander, 338 N.J.Super. 373, 390, 769 A.2d 427 (App.Div.2001), aff'd, 172 N.J. 147, 796 A.2d 874 (2002); N.J.S.A. 4:1C–9, found that he failed to qualify because his operation did not meet the definition of "commercial farm" as the SADC construed it. It did not reach the remaining requirements of N.J.S.A. 4:1C–3 and –9.

In its final decision, the SADC assumed that Tavalario needed to demonstrate only the $2,500 yearly income requirement applicable to a commercial farm of five acres or more, rather than the

$50,000 yearly income requirement applicable to smaller pieces of property, despite the fact that the land used by Tavalario for his alleged horse breeding operation was only 3.28 acres. Further, it recognized that the unrealized value of a horse could be used to satisfy the Act's production requirements. However, it found such to be the case only if the farmer had "an existing written contract to sell the horse for a specified amount of money within a specified period of time." It held further:

> With regard to income received for equine activities, the SADC's position is that the following can be used to satisfy the production requirements in the definition of commercial farm.
>
> • Income from sales of horses that have been bred on the farm, as breeding of livestock is clearly agricultural production.
>
> • Income derived from raising horses.
>
> • Imputed income from pasturing horses, as determined by the State Farmland Evaluation Advisory Committee created pursuant to *N.J.S.A.* 54:4-23.20.[4]
>
> • Stud fees, as the stallion is being used for breeding/agricultural production.
>
> The following income cannot be used to satisfy the production requirements:
>
> • Earnings from races, as this income is not agricultural production.
>
> • Fees received from boarding or training horses.[5]

The SADC found that Tavalario did not meet the standards that it had established, because "his farmland assessment and federal tax forms showe[d] gross profits of less than $2,500 annually, and the record [did] not contain contracts for sales of horses that would qualify as anticipated income." Such was the case, it found, even if income were imputed from the pasturing of horses at the 1998 rate of between $70 and $77 per acre applicable to land in Gloucester County.

---

[4] This reference is again to the Farmland Assessment Act of 1964.

[5] The SADC's holding in this regard reflects the substance of pending rule proposals that address agricultural management practices for equine activities. *See* 36 *N.J.R.* 3326(a) (July 19, 2004) (proposing new rules *N.J.A.C.* 2:76–2A.10 and –2B.3).

### III.

We find no grounds for reversal of the SADC's interpretation of the production requirements of the definition of "commercial farm" found in *N.J.S.A.* 4:1C–3 or its application to Tavalario's case.

As we have noted, the Right to Farm Act preempts local land use regulations, thereby permitting uses that would otherwise be nonconforming. Additionally, it grants significant privileges to qualifying owners and operators of commercial farms including an "irrebuttable" presumption that no duly recognized commercial farm that does not pose a direct threat to public health and safety "shall constitute a public or private nuisance, nor interfere with the use and enjoyment of any other land or property." *N.J.S.A.* 4:1C–10. In this light, we find it reasonable for the SADC, in balancing an owner's right to farm against other interests, to construe the production requirements of the Right to Farm Act narrowly so as to encompass agricultural production, not service or other activities, and to limit its scope to agricultural production that is commercial in nature.

Additionally, we find that the SADC's interpretation accords with the construction that has been given to the Farmland Assessment Act of 1964, *N.J.S.A.* 54:4–23.1 to –23.24, a statutory tax valuation scheme upon which qualification under the Right to Farm Act partially depends, which operates in a complementary fashion to provide financial incentives and protections for owners and operators of commercial farms.

Application of the Farmland Assessment Act, like the Right to Farm Act, requires evidence that the taxpayer has met a monetary threshold, which in the case of the Farmland Assessment Act, is specifically limited to "gross sales of agricultural or horticultural products produced thereon," soil conservation payments, breeding fees, and income imputed to land used for grazing. *N.J.S.A.* 54:4–23.5. Although the Farmland Assessment Act also recognizes as qualifying fees those received as the result of the maintenance of facilities for boarding, rehabilitating or training livestock, it does

so only when the land underlying such facilities is contiguous to land that otherwise qualifies for valuation, assessment and taxation under the Act. *Ibid.* Thus, it is clear that the emphasis of the Farmland Assessment Act is on fee-generating activities, confined almost exclusively to those resulting from agricultural production, rather than service activities.

A similar focus appears in the Farmland Assessment Act's description of "land deemed in agricultural use" found in *N.J.S.A.* 54:4–23.3, which provides such land "shall be deemed to be in agricultural use when devoted to the *production for sale*" of various categories of plants and animals, including horses. Regulatory provisions are likewise focused on commercial use. *See N.J.A.C.* 18:15–1.1 (definition of "agricultural use"), –6.1 and –6.2.

In light of the common goals of the Right to Farm and Farmland Assessment Acts, we find it reasonable to read the two acts in *pari materia* so as to derive support from the related tax act for the SADC's interpretation of the definition of "commercial farm" as requiring clear evidence of actual or future receipt of income from agricultural production. *Mimkon v. Ford,* 66 *N.J.* 426, 433, 332 *A.*2d 199 (1975); *Brown v. Twp. of Old Bridge,* 319 *N.J.Super.* 476, 498, 725 *A.*2d 1154 (App.Div.1999), *certif. denied,* 162 *N.J.* 131, 741 *A.*2d 99 (1999).

We note further that in construing the Farmland Assessment Act, the courts, while recognizing that the period for maturation of specified products may exceed one year, have consistently required proof of the value to be realized from the sale of agricultural and forestry products and animals in a manner similar to that required by the SADC. For instance, in *Estell Manor City v. Stern,* 14 *N.J.Tax* 394 (1995), the court found the subject forested property did not qualify for farmland assessment. In finding that the income requirements of *N.J.S.A.* 54:4–23.5 had not been met, the court observed that there was no evidence that "income to meet the requirements of the Act would be realized in a reasonable time. Although there is an estimate in the plan [for tree harvesting] that certain receipts would be realized, the time when

the receipts would be realized was not specified." *Id.* at 417. Moreover, neither of the landowner's expert foresters testified to the amount of income that would be received from any harvesting. "Yet," the court observed, "the Act requires clear evidence of anticipated yearly gross sales at least equal to the minimum income requirements within a reasonable period. *N.J.S.A.* 54:4–23.5." *Ibid.*; *see also Califon v. Stonegate Props., Inc.*, 2 *N.J.Tax* 153, 167 (1981) (recognizing the necessity for maturation of trees and the concomitant need to treat the income requirements more flexibly in this context, but finding that the "vague testimony" of the forester did not meet the Act's requirement of clear evidence of anticipated yearly gross sales at least equal to the minimum income requirement within a reasonable period); *Green Pond Corp. v. Rockaway Twp.*, 2 *N.J.Tax* 273, 284 (1981) (finding evidence demonstrated the potential for yearly income meeting statutory requirements, but no proofs directed toward the sale of forest products within a reasonable time), *aff'd in part, appeal dismissed in part*, 4 *N.J.Tax* 534 (App.Div.1982); *Urban Farms v. Twp. of Wayne*, 159 *N.J.Super.* 61, 64, 66, 386 *A.*2d 1357 (App. Div.) (finding that land dedicated to a woodland management program for the commercial production of lumber qualified for tax assessment as farmland when the owner produced evidence of a ten-year contract for the management of the land so as to increase its productivity from $2 to $20 per acre as well as evidence of current sales from selectively thinning growth), *certif. denied*, 78 *N.J.* 330, 395 *A.*2d 199 (1978).

█ As a consequence of the foregoing, we find the SADC's interpretation of the definition of "commercial farm" constitutes a permissible construction of the statute that accords with the court's interpretation of similar provisions of the Farmland Assessment Act. We agree that a horse, like timber, requires a period of maturation. However, a horse is also like timber in that it can be enjoyed without any contemplation of sale. Alternatively, its sale can be fortuitous both in circumstance and timing, and not the product of a concerted commercial program of animal husbandry. In this light, the SADC's acknowledgement of the

potential for future sale, but its requirement of clear proof that such sale will occur and the terms of the sale can be viewed as creating a reasonable method of distinguishing between those engaged in the commercial agricultural production protected by the Act and those merely keeping horses for private use, thereby achieving a reasonable balance between the protection of commercial farm operations and the "varied and sometimes conflicting interests of all lawful activities in New Jersey." *N.J.S.A.* 4:1C–2e.

Moreover, we find no error in the manner in which the SADC applied its interpretation to this case, finding that Tavalario failed to produce evidence that, in 1998, he had any reasonable expectation of selling any of his horses, the time at which the sale would occur, the use for which the horses would be sold, or their sale value. His claim of unrealized future earnings was thus unsupported by any evidence of how those earnings reasonably could be recognized or calculated. We also find no error in the SADC's refusal to recognize race earnings in determining whether Tavalario met the monetary threshold of the statute, since such earnings are in large measure divorced from the agricultural production that the Right to Farm Act was enacted to protect, and in any event, no race winnings were claimed by Tavalario for the year at issue or quantified thereafter. Finally, we find as did the SDAC that insufficient proofs were presented to support Tavalario's claim that in 1998 he relinquished the right to stud fees in an amount that would have met the statute's monetary threshold so that he could participate in the New Jersey Breeders Fund incentive awards program, finding no evidence that waiver of stud fees was a condition of the program and no basis for calculating breeding incentives if in fact waiver were required.

We thus affirm the SADC's final decision finding Tavalario did not meet the requirements of the Right to Farm Act and was thus not entitled to its protections.

IV.

Tavalario also claims that the SADC's decision is null and void, although the decision was postmarked on the forty-fifth day after

the ALJ's initial decision, because it was not transmitted to the Governor's office until seventy-one days after the ALJ's decision was rendered. We find no merit in this argument.

 *N.J.S.A.* 52:14B–10(c) requires that an agency head, upon review of the record submitted to the ALJ, shall adopt, reject or modify the recommended report and decision "no later than 45 days after receipt of such recommendations." If the agency head fails to do so, the decision of the ALJ shall be deemed adopted as the agency's decision. *Ibid.* The purpose of the statute is to encourage prompt consideration and disposition of contested cases. *N.J. Racing Comm'n v. Silverman,* 303 *N.J.Super.* 293, 302, 696 *A.2d* 771 (App.Div.1997). That purpose was fulfilled in this case by the issuance by the SADC of its own final decision rejecting the conclusions of the ALJ and mailing of that decision within the mandated forty-five day period in an envelope post-marked July 29, 2004.

Tavalario argues that the SADC's decision is nonetheless void pursuant to the terms of the Right to Farm Act because it was not promptly sent as a part of the SADC's minutes to the Governor. His argument is not supported by that Act, which provides in *N.J.S.A.* 4:1C–4(f):

> A true copy of the minutes of every meeting of the committee shall be prepared and forthwith delivered to the Governor. No action taken at such meeting by the commission shall have force or effect until 15 days, exclusive of Saturdays, Sundays and public holidays, after such copy of the minutes shall have been so delivered. If, in said 15–day period, the Governor returns such copy of the minutes with a veto of any action taken by the commission at such meeting, such action shall be null and void and of no force and effect.

Rather than specifying the time for delivery by the SADC of minutes to the Governor, the statute provides only that a SADC action set forth in the minutes cannot be enforced until a fifteen-day review period has passed without the governor's veto. Therefore, although the SADC's delay in submitting its minutes thus postponed the effective date of its decision, it did not affect its ultimate validity in the absence of a veto. Further, if a time period for submission were to be inferred, Tavalario has presented

no evidence of bad faith, inexcusable negligence or gross indifference on the SADC's part in transmitting its decision as part of its minutes when it did, so as to render its decision unenforceable. *Cf. N.J. Racing Comm'n, supra,* 303 *N.J.Super.* at 303, 696 *A.*2d 771; *Matturri, supra,* 173 *N.J.* at 379–380, 802 *A.*2d 496.

The final decision of the State Agricultural Development Committee is affirmed.